231118 and 231166, Connecticut Fair Housing Center and United States v. Corelogic Rental Property Solutions Let's wait one minute for everybody to get settled Okay. Mr. Dunn. Good afternoon. Good afternoon, Your Honors, and may it please the Court. I'm Eric Dunn. I'm representing the Arroyos and Connecticut Fair Housing Center today. I'd first like to touch on one of the issues concerning the file disclosure claims and the reasonable accommodation claims. Before we get to those other issues, how is it that the Connecticut Fair Housing Center has standing to sue Corelogic or to pursue these claims? They haven't applied for housing and been denied housing, right? Correct, Your Honor. This is a — Connecticut Fair Housing Center is a fair housing center. It falls squarely within the Havens tradition of a fair housing center that can bring an action to enforce the Fair Housing Act when they show that — Diversion of resources. That's the argument? Frustration, admission, and diversion of resources, yes. Didn't the Supreme Court just tell us in Food and Drug Administration v. Alliance for Hippocratic Medicine that the diversion of resources of a public interest group isn't sufficient for standing? Well, that was a situation where the public interest group hadn't shown any direct injury that was caused by what they were complaining about. Whereas in this case, the — Well, I know that the Supreme Court said that they — said that the FDA has forced the associations to expend considerable time, energy, and resources drafting citizen petitions to the FDA, as well as engaging in public policy advocacy and public education. And all of that has caused the associations to spend considerable resources to the detriment of other spending priorities. But an organization that has not suffered a concrete injury caused by their action cannot spend its way to standing simply by expending money to gather information to advocate against the defendant's action. An organization cannot manufacture its own standing in that way. Right? So it hasn't the Supreme Court said that this theory of standing, that you're spending resources to advocate against what a defendant is doing, is not sufficient to go for standing? That's in the context of an organization that claims an injury to its mission because of something that they disagree with ideologically. No, it's not. It says you can't spend your way to standing. So they are — they did say that they had expenditures that diverted their resources. Right? Well, Your Honor — Okay, I get it. So your argument is you think that the Connecticut Fair Housing Center is different from the Alliance for Hippocratic Medicine, and somehow you have suffered a more concrete injury. Why? Because you're spending money. The Supreme Court in the Meffitt-Bristown case specifically distinguished the Havens case, in which the Fair Housing Center, substantially the same as Connecticut Fair Housing Center, in that case was Home of Virginia. Right. They said that's different because Havens — sorry, because the defendant there impaired Homes' ability to provide counseling and referral services to low- and moderate-income House home seekers. Does your client prepare counseling and — provide counseling and referral services? Not housing and counseling and referral services, but they do other Fair Housing activities. For example, they had undertaken grant work to address problems with homeless shelters not allowing assistance to animals. They had undertaken steps to address a problem of foreclosures. So you can proceed to the merits question, as you were going to do. Okay. I will also add, Your Honor, that during trial, in the course of presenting evidence on the frustration of mission and diversion of resources of Connecticut Fair Housing Center, the trial judge stopped us and basically asked, is it necessary — Yeah, the trial judge said it's not contested, but of course, saying it's jurisdictional, so it doesn't really matter if it's contested. But then you eventually — but the evidence you wanted to introduce was about diversion of resources and frustration of mission. Right? Exactly. And we would have been able to make a complete showing on that had the court not agreed that it was not necessary because it had already been established on summary judgment. And then defense counsel agreed to waive further objections to the issue. Okay. I also wanted to touch on the issue of the seal on the conservatorship certificate that CoreLogic received. The — several courts have considered different types of documents that require to have an impressed seal. This is a type of seal that just has a stamp where it crinkles the paper to make a seal, but it doesn't have any ink or anything. And multiple other courts have recognized that those types of seals don't reliably show up on photocopies and fax transmissions. And so what those courts have decided is that they're not going to treat the absence of a visible seal on a copy of one of those documents as any kind of evidence that the original doesn't have the seal. And what that means is that someone that receives a copy of that document can rely on it with the expectation that the original document has the seal. And you're saying that's the right answer as a matter of law? I'm saying that's what five U.S. district courts have decided involving mortgage instruments, affidavits, and judicial summonses. And I don't see any reason — What does Connecticut say about it, though? I mean, the question is, isn't the question whether Connecticut allows — relies on that? Because the — this is a — the conservatives' authority comes from Connecticut law and Connecticut judgment, right? Right. But there's no authority in Connecticut on the issue of a copy. Well, wait a second. I'm looking at JA-475, which is the certificate that was sent. And clearly — is this a certificate that's approved by the — by the State of Connecticut? Your Honor, the certificate that I've been relying on in my preparation is that JA-127, which is the one that was faxed. It has what court logic has called a marred image of the seal. I would agree with that description. And it says clearly not valid without court-approved seal and press. Right. And that's the original document is not valid without the seal. So what I'm talking about is a copy of the document. And, of course, anything that's on the original is also going to be on the copy, but you're not necessarily going to see — except for the impressed seal, which is not in ink. But it says in big letters that it's not valid without the seal, right? Maybe that is the original. So if the — if court logic has an obligation to make sure that somebody is entitled to this documentation and the thing that gives them the power of attorney says it's not valid without the seal, is it really unreasonable to require some evidence that the document they're sharing has the seal? Yes, because this type of seal does not show up when it's photocopied or faxed. Oh, you just take it in. She was the conservator. You carry it with you and you walk in with it and you present it. Your Honor, there's no physical office to carry these documents. She's living there. No, no, no. This is to the tenant screening company that she was requesting a disclosure from. She doesn't know where they are. They don't have a physical office she can go to. She has to send it remotely. She can't present it to the rental agent at the — No, absolutely not. But court logic is not the rental agent's, right? Right. The rental agent provided court logic's phone number, in this case, on a sticky note. And so Ms. Arroyo had to call them on the phone, and then she faxed the certificate the same amount of time. Can I ask both — so just before you sit down, can I ask about the claim that went to trial? So if the — Ms. Arroyo just never — let's say we think that she does need to provide the document with the seal, right? So she wasn't entitled to get the credit report because she hadn't provided sufficient documentation. How could it be a violation of the Fair Credit Reporting Act not to provide her a report to which she couldn't give the documentation that would entitle her to it? Well, because under the statute, 15 U.S. Code 1681a, a consumer has the right to obtain a copy of their disclosures, or in this case, the conservator obtaining the disclosures of the board. And a consumer reporting agency is going to frustrate that right if they say you didn't provide us the kind of identification that we need, and then they don't say here's what you can provide to get it. So by not telling her accurately, the problem here is you didn't provide it. So there's somebody who tells her inaccurately that you need a power of attorney, and they don't appreciate that the conservatorship confers the power of attorney, right? Correct. But at the same time, the district court also determined that she hadn't provided the adequate copy of the conservatorship certificate that would entitle her to it all along, right? So the district court's holding is she had not provided the documentation that would allow her to get the credit report, even if there's some other reason that maybe somebody else was denying it, right? So I guess my question is if they're withholding the report for a legitimate reason, how is it a violation that somebody also mentioned an illegitimate reason to withhold it during that time period? The violation in that instance would be that they didn't tell her the reason that she hadn't provided adequate identification. They didn't tell her what was missing. They didn't say we would provide this report to you if you had a conservatorship certificate with a visible seal, but the one we got doesn't have a visible seal. Instead, they said you need a power of attorney, which is a completely different thing that she was incapable of obtaining because a person who's conserved can't sign a power of attorney.  Thank you very much, Mr. Dunn. Let's hear from Ms. Bortnick. You can lower that. May it please the Court. Yael Bortnick for the United States. I'd like to address a narrow but important issue in the district court's opinion. It's error in concluding that CoreLogic is not subject to the Fair Housing Act. That conclusion cannot be squared with the text of Section 3604A, which bans outcomes. It doesn't specify who the actor is or how the actor brings about a prohibited conservation. This one's right. So, I mean, I think it probably is a mistake to say that CoreLogic is just completely outside the scope of the Fair Housing Act. But, you know, the primary feature case you have to make for a violation at step one of our test, you do have to show that there's causation, right, between their conduct and the denial of housing, right? Yes, that's correct. So if you read what the district court said, the district court basically says that the plaintiffs hadn't made a showing of causation, right? So I would just understand exactly what the district court said as a conclusion that you hadn't met your burden of establishing a primary feature case at step one. So we would disagree with that premise. The district court says at page 34 that as an initial matter, it couldn't address the discriminatory impact claims without deciding whether CoreLogic is subject to the Fair Housing Act.  I'm saying that the district court thought of it as this kind of threshold determination, like a step zero. But what the district court was describing was causation, right, whether it was CoreLogic's conduct that caused the denial of housing or CoreLogic was just a service provider to the landlord and therefore it's the landlord's decision and therefore CoreLogic is not responsible for the denial of housing, right? That's what the district court is making findings about, right? And so that – you don't disagree that that issue would be relevant at step one? We don't disagree that issue would be relevant. We don't think that the district court did the entirety of the necessary analysis for step one. It focused narrowly on whether CoreLogic controls the housing provider's ultimate decision, whether it has the power to intervene over housing providers, whether it can direct a housing provider to accept or reject an applicant. And that would be incompatible with the cases holding that insurance providers and appraisers are potentially liable under the Fair Housing Act. It's too narrow of – Well, they're potentially liable, but they only are liable when they actually can be said to have caused denial of housing, right? Correct. Okay, so I maybe disagree with the court's analysis, but now I'm just focused on whether it's a threshold determination or it's step one. So the analysis the district court did made me think it was insufficient, but it is a causation analysis. So if the district court's mistake was conceiving of it as a step zero as opposed to step one, it is the issue the district court was supposed to address at step one, right? Causation is the issue the district court was supposed to address at step one, including whether CoreLogic – So if in fact the district court were right that CoreLogic's conduct or the policy and practices of CoreLogic cannot be said to have caused the denial of housing, then the plaintiffs would have failed to make a prima facie case at step one, right? Yes, and we aren't taking a position on the merits, but we do believe that the district court's analysis missed the particular practices that are alleged to have directly caused that discrimination, including combining different crimes into one category so that landlords can't exclude vandals without also excluding certain people who have traffic offenses. Well, the district court makes a finding that everything that they provide is at the option of the landlord and that they also encourage the landlord to look at the underlying documents and so on to make its own decision, and that no reasonable juror could conclude that the landlord would understand CoreLogic as making the determination. Now, if those are correct findings, wouldn't that show that there is no causation? Again, we don't take a position on the ultimate merits, but the district court did focus narrowly on two particular theories without looking at the third theory presented, that CoreLogic's actions in sum effectively encourage, facilitate, or assist in the discrimination, and that the particular practices of framing the outer bounds of the criteria that landlords can choose from contributes to the ultimate report that's created. But you think they didn't address it, but this idea that they're addressing causation is something that should be considered at step one, right? Yes. Now, I mean, do you generally agree that if, in fact, somebody is simply a service provider to a landlord and providing the raw data on which it makes its decision, it can't be said to cause the landlord's decision? That would be a different case. I think it would be hard in that scenario to identify at step one a practice or policy of the data provider that's causing the discrimination. Here there were practices identified. That's what makes CrimSAFE different and more extensive than CrimCheck. It isn't just providing raw data. It's contributing to the creation of the report by filtering out certain records. By not allowing even the option to not provide it or to not, you know, to have. . . You're saying because of the options it gives the landlord, it's implicated in the landlord's decision? That's the whole premise of CrimSAFE, why it's more expensive. It's marketed, designed, and used as a product that assists a landlord in making those decisions. But the point to how it was used here is not as to its broader capabilities or how a particular landlord might employ it. And there are very specific findings here with regard to the choices that the landlord made, both with regard to categories, the distribution of the information, and those who would be able to review it and appreciate the particular information that resulted in the quote, records found determination, right? We don't disagree that the district court's findings are relevant to that ultimate causation analysis, but. . . Right. I mean, from pages 37 through 46, the court went through and very specifically reviewed each one of those issues. And particularly at page 45, Roman numeral, or double I, whether CrimSAFE prevents individualized assessment, which is really kind of the focus of your brief, because at least I gathered that. Your view was is that the information, because CrimSAFE grouped things, and then made it such that you couldn't pull out the particulars of an individual's crime or know about it, that somehow that then limited the choices and therefore played a role in what could be seen as disparate impact discrimination, right? That the district court needed to evaluate that and whether those. . . because the person who was doing the rent talking to Mrs. Arroyo or Ms. Arroyo wasn't able to look at the underlying arrest information, but there was someone working for the landlord who had access to that information, wasn't there? The question, Your Honor, isn't. . . The district court looked at whether CrimSAFE entirely suppresses these records, but it didn't analyze the other ways that it could be. . . Well, I'm interested in this case, not in general for CrimSAFE. So what I'm interested in is had the landlord picked and designated someone who was able to know exactly what it was, what activity it was, that generated that records found determination? The district court said yes. Is that clearly erroneous? We don't take a position on the facts of this case, though. I wouldn't object to that. If it was not clearly erroneous, wasn't that then a finding that there was no proximate cause? Respectfully, the district court's opinion doesn't ever use the terms proximate causation. I know that. We all know that. And it's unfortunate, but she did, whether artfully or inartfully, went through and looked at the relationship between CrimSAFE and the landlord, and she went, oh, well, the landlord picked. . . The landlord had these choices. It didn't delegate values. Because the theory was is that the landlord just went along for the ride. And she rejected those things. And that's what she does here. She says, the plaintiff's also claimed poor logic violates the FHA from conducting individualized assessments. The plaintiffs have not proven this, she says. And then she goes on and talks about how that information is available. Is she wrong? Is that a clearly erroneous finding? And if you don't. . . All right, I'm not going to ask you to say that. But if she's not clearly erroneous, are they then out of the causal chain? We think that there are multiple ways in which criminal screening reports can contribute directly to the denial of housing. Very similarly to. . . And I would agree with you. I think you're right. I mean, your brief focus is on a number of ways that CrimSAFE can end up participating in the decision. And your theory is that because CrimSAFE limits the information or provides the opportunity to limit the information to the landlord, that then, therefore, it has a role with regard to the decisions. But my question to you was, if that. . . Judge Bryant seems to have rejected that in her decision. And I know you don't want to express a view about that. But my question to you was, if she did and it's not clearly erroneous, that then that's a bit different from the theory your brief focus is on as to how CrimSAFE would be responsible, right? Yes. We do think it's important to clarify, if that's this Court's opinion, that this isn't a threshold question and doesn't narrow the scope of the Fair Housing Act, that it can reach when causation is shown, tenant screening comes forward. Right. So you're here because you want to make the point that there is no Step 0 at which certain kinds of defendants are excluded from the scope of the Fair Housing Act. Yes, Your Honor. But you agree that Step 1 does have to show that the particular defendant did cause the denial of housing. And you don't express a view as to whether the district court's findings on that issue are correct. But if, in fact, we're correct that this defendant did not cause the denial of housing, the claim should fail at Step 1. Yes. Step 1 includes a causation analysis. Okay. And that's where that should take place. Thank you very much, Ms. Bortnick. We'll hear from the appellee, Mr. St. George. Good afternoon, Your Honor. Tim St. George, counselor for the appellee and Cross Appellant, CoreLogic Rental Property Solutions. Your Honor, based on the evidence presented at a 10-day trial, the district court found as a matter of fact that CoreLogic provides configurable software, but it does not make housing decisions. In fact, it doesn't even generally know what those decisions are as those decisions are being made. Fundamentally, we're here not because RPS denied Mr. Arroyo housing, but due to a series of inexplicable actions taken by Wynn Residential, contrary to their own policies and likely contrary to the FHA. Your Honor, to start with the statutory text, I think it's important to note that we are here on appeal only on a disparate impact theory under the FHA, which is Section 3604A, which requires that the defendant make housing unavailable. The plain text of the statute requires cause and effect, and it is certainly not legal error. It is, in fact, correct to start with the plain text of the statute, which requires causation. Now — Right, so whether it's conceived as a threshold determination about whether the defendant caused the denial of housing or that is perhaps more appropriately considered at the step one of the prima facie case, you think that that's where the claim fails? Absolutely. So I think it is properly considered at what Your Honor has described as step zero, given the plain text of the statute. You do think it does? Yes, because I think that the statutory language of making housing unavailable to look to the language of inclusive communities, for instance, when elaborating on that term, means to make or occur. So the statutory threshold requires causation. But it's ultimately irrelevant. This Court can affirm —  Step one is a prima facie case. Like, that also is a threshold. Absolutely. It's established a prima facie case that there's a practice that makes housing unavailable. Absolutely. Even if we can step — So there would have to be a separate step from — Even if we conceptualize the inquiry as having the FHA apply and then looking at step one, to use Your Honor's terminology, the claim fails. And the Court can affirm on that basis as well, notwithstanding the government sequencing argument. The district court here plainly made a causation finding. She invoked the relevant terms about making or occurring. She found there was no direct relation or direct connection. She cited these courts' causation decisions like in Manny.  What about the government's suggestion just now that the district court didn't take into account of some aspects of the plaintiff's argument that by grouping different offenses together and denying the landlord to make different selections and distinctions, they're implicated in the decision? So I would first advance a procedural argument. The district court analyzed the two theories advanced in the complaint with respect to the disparate impact theory of liability, paragraphs 194 through 196. It's not error for the district court to have confined the analysis to the pleadings that were actually advanced and litigated through trial. But moreover, the evidence repeats the proposition. CrimSafe, as found by the district court, provides all of the criminal information to the properties. It doesn't matter that certain categories on the front end, again, Your Honors, designed largely to filter out criminal records from consideration themselves by necessity, given the fact that it's considering crimes on a national basis, has to categorize them some way, like the FBI does and the CrimSafe tracks those categories. But all the information is provided at the very time that the CrimSafe court is delivered. There's no inability to dissect which crimes were reported for this person. Mr. Arroyo, of course, had one crime reported. It was a theft crime, and the record reflects it's reported as a theft crime. So CourtLogic could, if it didn't like the way landlords were using the information, just refuse to provide certain types of information, right? Does that make them liable under the FHA? Absolutely not. So CourtLogic allows their housing provider clients to select information within the restrictions of the Federal Fair Credit Reporting Act, which is the statute that actually does govern its activities. Criminal convictions are reportable without limitation under Federal law. Non-convictions are reportable within seven years. So CourtLogic does impose those parameters in order to stay consistent with Federal law. However, the fact that CourtLogic allows companies, again, to largely filter out records within certain categories that are allowed by Federal law does not somehow turn them into the decision maker, including when they have no role in the decision process. What if CourtLogic were falsifying some criminal records and providing to the landlord some false criminal records with the expectation that the landlord would rely on that and deny housing to somebody? I think to the extent that CourtLogic is itself interjecting its own judgment substance opinions into the process, that could be more problematic. Of course, the record here supports nothing of the sort. Yeah, but wouldn't that mean CourtLogic still would have the same relationship to the decision maker, right? So why would it matter if the records are true or false? So if the records are true or false, again, I don't know whether that would be an FHA claim, depending on whether or not, as opposed to something more akin to fraud or something along those lines. But I think the answer, in terms of the FHA, is what's the standard for who's the liable actor? Who is the direct cause of the action? And I do think in that scenario, it's the proximate cause. Right, the proximate cause. But to use the City of Miami standard, it's a direct relation standard under the proximate cause. So I think, again, to the extent that CourtLogic is the one interjecting the material into the record, obviously, it's fundamentally different. If CourtLogic did not provide or made available the underlying information as to the underlying event, the arrest, the actual record, to the landlord, if they had not made that option available to the landlord and only said to the landlord, records found, that would be a different case from a liability standpoint, wouldn't it? Absolutely. Because then they would have, it would be, the landlord would end up relying upon the representation record found. And so their representation would then play a direct role in a decision as to whether someone got a rental decision or not. Well, even in the situation that you've described, Judge, I think the landlord would be still setting the parameters. But, yes, I think it would be obviously factually different than what we have here. And the record has never supported the conclusion that CourtLogic didn't provide the information. The district court at trial found that contention to be inexplicable, to use her language, based on the records. Your Honor, I guess the practical matter just understood that even though the landlord could get the underlying records, they just kind of relied on whatever result was provided by CourtLogic. Would that mean that CourtLogic was a cause of the unavailability of housing? I don't think so, because I don't think subjective knowledge of the actions taken by another party impute FHA liability. Your Honor, you can go back to the Second Circus decision in Francis. It was a disparate treatment case. But when there's an attempt to hold a landlord liable for discriminatory treatment of the residents that were living here, and the court said, you know, pump the brakes, there's no basis to impute the FHA to knowledge of the conduct of another party. But here we don't even have that. The record reflects that CourtLogic.  Can I ask about the claim, I guess, that you're cross-appealing? Yes. So under the Fair Credit Reporting Act, you had to provide the credit report, and you didn't. And I take it your argument is that she wasn't entitled to the report because she had to provide an adequate identification or the power of attorney, you know, either whether it's from a power of attorney document or from a certificate with a seal. But, you know, Postal Counsel just said, but you told her she had the power of attorney, so she didn't know what to do to provide adequate documentation. So why isn't that a Fair Credit Reporting Act violation? The requirements of the documentation are on the face of the documentation. And Ms. Arroyo is not disabled. She volunteered to be the court-appointed co-conservator. And the concept that an individual would have to supply an original or some type of certified copy of a record is certainly not foreign to anyone involved in this appeal. But to go to the language of the statute, it's the consumer's exclusive burden to provide proper identification. It's a conditioned precedent. And the statute says a consumer reporting agency shall not release a consumer file except upon receipt of proper identification. And when the substance of proper identification Yeah, but they also, the statute also authorizes the reporting agency to require proper identification, which suggests that there is some discretion as to what is the proper identification, right? Well, there's some discretion. So if CoreLogic wanted to accept the facsimile of the conservatorship certificate and not require a visible seal, would they be allowed to do that? I don't think they would have been allowed to do it under Connecticut probate law, as established by the face of the court order and the other Connecticut probate decisions like Johnson that we cited in our briefing. It would put CoreLogic in an untenable catch-22. You either violate the FCRA for accepting a facially deficient document under state law, or you violate the FCRA by releasing information with insufficient documentation. I also want to talk about the FCRA just briefly because we've also raised a jurisdictional argument that based on the facts induced at trial, it became clear and was never proven that any of the file disclosure issues, which are fundamentally disconnected from a housing application, had any impact on Mr. Arroyo's ability to get housing. The court, the court had But I mean, the statute gives him an entitlement to get the report, right? And he claims an entitlement to the report under the statute and he was denied it. Right. Isn't that itself an injury? Well, at most, it would be an informational injury, and I'd simply direct your honor to your recent decision. Yeah, I know. So in TransUnion and in Guthrie, right, a lot of those reporting requirements are passive, right? The employer is required to just give the employment information, and in TransUnion, there's a bunch of credit reporting that's going on behind the scenes. And in those cases, you don't know whether somebody suffered an injury because they might never have looked at it or even known what was going on. But in this case, Ms. Arroyo made an affirmative request for a report that she wanted to receive. Right. Isn't that different than other cases where, you know, somebody who's supposed to receive a report, it's not clear whether they cared or even noticed? Well, in Ramirez, the court was addressing the file disclosure recipients, and a file disclosure obligation is only triggered upon request. So by necessity, the court was addressing a cohort of individuals who had affirmatively reached out to TransUnion. So no, your honor, I don't think it makes a difference. And the court's focus in TransUnion was on downstream consequences. Well, that's just to get damages, right? So the idea is they don't have standing to pursue the statutory damages because they didn't actually suffer an injury, right? Yes. So here that would mean maybe she had standing to pursue a claim to get the document, but she wouldn't have standing to get the statutory damages because it didn't really show an injury. Well, I think the fact of being able to show an injury is a fundamental prerequisite to be able to invoke the statute in federal court in the first place. You can't slice and dice the remedy. It's more fundamental than that. Okay, but in any event, whether you conceive of it as she's not entitled to the document or she didn't suffer an injury, your point is because she didn't provide adequate identification up front, she's not entitled to the document, and the district court made a finding that it's not clear she ever would have done that and ever would have received it. And so anything that your client said in the course of dealing didn't make a difference. Yeah, that's right, your honor. So if she wasn't entitled to the document, she didn't satisfy a statutory condition precedent. And despite the district court's agreement that she did not satisfy a statutory condition precedent, the district court then wants to award people. Even the seal requirement is just clear from the face of the document. But what if actually your client made up a requirement that just is completely arbitrary? Like you need to give us some kind of notarized document in triplicate to provide adequate identification, and they don't really explain the requirements and they just deny it on that basis. Would that be a different case? Sure. It would come down to a dispute in that context of what constitutes proper identification. That term is not defined under the FCRA, but it has to have limits when it's prescribed by state law, which is the situation that we're facing here. But wouldn't that be a dispute over, like, what the word proper means under the statute? I think it comes down to whether proper identification can include an action that would cause CoreLogic not to violate state law when the document that's provided itself has conditions to make the document proper. Your argument here depends on the state law requirement that the certificate is valid only with the seal. I think the argument here is contingent on that fact, yes. I think the operation of state law is critical to that point and was an argument that the district court credited. One factual point I want to mention is we heard from appellants that somehow she couldn't have had the opportunity to send an original. She communicated with RPS by mail. She mailed in a packet of information. She just never mailed in an original certificate. CoreLogic reached out to her. She had the mailing address. She responded. All she had to do was include a certified copy to make it effective under state law. Thank you. Okay. Thank you very much, Mr. St. George. We'll turn back to Mr. Dunn on rebuttal. I think the fundamental problem with CoreLogic's argument on the 3604A question is that we didn't need to show that CoreLogic approximately caused the denial of housing. We only needed to show that what CoreLogic did were substantial steps that made it less likely that Michaela Royal was going to be admitted. Well, that's because it told us there's a robust causation requirement, right? There needs to be a direct relationship between the practice and the denial of housing. Absolutely. But we only needed to show that they impeded. They made it less likely that Michaela would be admitted. It's not an either-or who made the decision. And it's not a question of was he ultimately admitted after some consideration. But it's did CoreLogic do something that reduced his chances of getting in? And this is not a traditional... There can be more than... Approximate causes is not exclusive. Exactly. There can be many approximate causes, but they have to be proximate. Exactly. And it was because the facts in this case show that the leasing agent for ArtSpace ran the CoreLogic report. She got it back. It said records found. She turned to Carmen Arroyo and said it's declined. So there wasn't any other intervening step that would have taken. There was no time for any intervening review or anything. Under the Lohman v. Platinum property management case we cited in our brief, that case holds that a denial occurs as soon as the applicant is told that they're rejected, even though in that case, the person was rejected for providing incomplete information and was specifically told we can review this if you provide a copy of your driver's license... Who made the choice not to give her the information? So the way that this system is configured is that... The landlord. Well, the leasing agent doesn't have access to the full report. Who made the choice to not give her access to the information? Are you referring to the CoreLogic report? Yeah. I mean, you have to get it from CoreLogic. The underlying information that generated the report. She could only get it from CoreLogic. Now, the landlord does configure their system to limit which employees have access to it. Okay. But keep in mind that, you know, Wynn Residential is one of the largest rental property management companies in the country. They have over 100,000 units. And, you know, the facts show that the leasing agent that Carmen Arroyo was dealing with didn't have access to the full report. Her supervisor didn't have it, and he didn't even know how to get it. So, yes, it's true that somebody at Wynn Residential could have reviewed this. But as a practical matter, you know, when this report comes back declined, that puts you in the box of you're not getting in, and the only way that you will get in is if there's some kind of later review. So you have a more difficult process. So the use of the landlord is attributable to the provider? CoreLogic acts as basically in the place of a traditional leasing agent. It's a computer program that carries out the traditional role of evaluating the applicant information. It just provides a decision. And so under the U.S. Supreme Court case, Connecticut v. Teal, you know, something that creates discriminatory headwinds, something that makes it more difficult to be hired in that situation here to be admitted, is attributable. Then you have to look at it. I think we have that argument. Thank you very much, Mr. Dunn. Thank you. The case is submitted.